### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| MELVIN E. MOSLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 04-1144 |
| | ) |
| MAYTAG CORPORATION, | ) |
| | ) |
| Defendant. | ) |

### O R D E R

This matter is now before the Court on Defendant, Maytag Corporation's ("Maytag"), Motion for Summary Judgment. For the reasons set forth below, Maytag's Motion for Summary Judgment [#19] is GRANTED.

### JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the claims asserted in the Complaint present federal questions under Title VII, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981.

### FACTUAL BACKGROUND

Plaintiff, Melvin Mosley ("Mosley"), was hired by Admiral Home Appliances in 1964 as a production worker in its Galesburg, Illinois, plant. The plant was then purchased by Rockwell, which promoted him to the position of Supervisor, Door Production in 1975, before the plant was taken over by Magic Chef. This position required Mosley to train and supervise anywhere between 15 to 103 employees and made him responsible for keeping a production schedule, making sure that all work met quality standards, keeping the

production chain moving at a quick pace, and supplying up to five other assembly lines. In 1988 or 1989, Maytag acquired the Galesburg plant from Magic Chef.

During the relevant time, Diana Whitson ("Whitson") was the Manager, Staffing and Compensation and then Manager of Human Resources at the Galesburg plant. Kevin Bradley ("Bradley") was the Employment Relations Manager, and Gregory Irwin ("Irwin") was the Vice President, Human Resources. Ronnie Unger ("Unger") was the Senior Production Manager.

Human Resources' policy was to make information about available positions known at production meetings, to inform other superintendents of openings, and to ask for recommendations. As a result, the hiring manager or other managers at his/her level had to identify an internal candidate that was "qualified" for the position in order for that candidate to be considered for the position. Human Resources was to oversee this process. At some point in 1999 or 2000, Mosley approached Whitson and expressed dissatisfaction with the policy of not internally posting management positions higher than entry-level supervisors and also complained that African American employees were not given the same promotional opportunities as other employees.

In April 2001, an opening became available for the General Supervisor, Door Production. It is undisputed that Unger made the ultimate hiring decision with respect to this promotion. In his deposition, Unger testified that although Mosley and other internal candidates were specifically considered, there were no internal candidates that were qualified for this position. He further stated that he rejected Mosley as a candidate because he had received complaints about Mosley's management style and interpersonal skills, and that he did not believe that Mosley had the leadership capabilities and drive necessary to

succeed in the position.¹  Mosley claims that he was qualified for the position and that Maytag wrongfully denied him the promotion based on his race.

An external candidate, William Ginglen ("Ginglen") was hired to fill the position of General Supervisor, Door Production.  However, in October 2001, Maytag announced a reduction in force which involved combining certain jobs.  The General Supervisor, Door Production position was combined with the General Supervisor, Scheduling position.  Ginglen was terminated on October 10, 2001, and Larry Lamb ("Lamb"), the Director of Manufacturing Support Operations, selected Lawrence Sobie ("Sobie"), who had been the General Supervisor, Scheduling, to fill the combined position on October 15, 2001.  Although Maytag considered only internal candidates in General Supervisor titles for this position, Mosley claims that he was "qualified" and that Maytag wrongfully denied him a promotion to this position, as well.

On January 31, 2002, Mosley filed a charge questionnaire with the EEOC that was then perfected into a charge of discrimination.  The charge alleged that his failure to receive either the April or October 2001 promotion was the result of discrimination based on his race.  Maytag received notice of the charge in February 2002, and again in April 2002.²

---

¹ Plaintiff objects to this evidence as hearsay.  However, Defendant is not attempting to offer the substance of the complaints for the truth of the matter asserted, but rather is offering Unger's personal knowledge of the complaints as evidence bearing on his state of mind as the decisionmaker.

² Although Mosley devotes a good deal of his response to arguing that he did not receive promotions to General Supervisor in Door Factory in February 2000 and Lead Supervisor in Door Production in June 2002, these promotions are simply not on the table in this litigation.  As both the Charge of Discrimination and Complaint in this case make reference only to the April and October 2001 promotions, Mosley is barred from injecting additional promotional decisions into the case on summary judgment.  Schnellbaecher v. Baskin Clothing Co., 887 F.2d 124, 127 (7th Cir. 1989); Alexander v. Gardner-Denver Co., 415 U.S. 36, 47 (1974).  As "claims brought in judicial

Sobie subsequently added additional goals and responsibilities to Mosley's merit appraisal and gave him an additional work assignment to inventory the factory's doors. Mosley asserts that these actions were taken in retaliation for his having filed the charge of discrimination with the EEOC.

The EEOC charge was mediated on August 16, 2002. Whitson and Bradley participated in the mediation on behalf of Maytag, and Professor Fred Hord ("Hord") of Knox College participated as Mosley's advocate. Mosley received a right-to-sue letter from the EEOC on February 3, 2004.

On May 7, 2004, Mosley filed this suit alleging that he was denied promotions as a result of racial discrimination and that he was also the victim of retaliation for having filed a charge of discrimination. Maytag has now moved for summary judgment. The matter is fully briefed, and this Order follows.

**LEGAL STANDARD**

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of

---

proceedings must be within the scope of the charges filed with the EEOC," and "[a]n aggrieved employee may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination," Mosley's new claims with respect to the February 2000 and June 2002 promotions must be rejected. Conner v. Illinois Department of Natural Resources, 413 F.3d 675, 680 (7th Cir. 2005). The Court would further note that the February 2000 promotion would have been more than 300 days prior to the filing of his EEOC questionnaire on January 31, 2002, and would thus be barred by the statute of limitations. The June 2002 promotion would have occurred after the filing of the EEOC charge, and therefore, could not have been presented to the EEOC in Mosley's filing.

informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." Id. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. Celotex, 477 U.S. at 324. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

## DISCUSSION

I.   Disparate Treatment

Title VII prohibits employers from discriminating "against any individual with respect to [his] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 2404 (1986). Under Title VII,

the plaintiff is required to establish that he has been the victim of intentional discrimination. Mojica v. Gannett Co., Inc., 7 F.3d 552, 561 (7th Cir. 1993). The plaintiff may present direct proof of discrimination, Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775 (1989), or may rely on indirect evidence using the McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973), burden shifting method of proof.[3]

### A. Direct Method

Here, Mosley argues that he can proceed under the direct method. A plaintiff proceeding under this method may rely on either direct evidence or circumstantial evidence. Logan v. Kautex Textron N. America, 259 F.3d 635, 638 (7th Cir. 2001). "Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption. . . . Direct evidence is a 'distinct' type of evidence that uniquely reveals 'intent to discriminate[, which] is a mental state." Rudin v. Lincoln Land Community College, 420 F.3d 712, 720 (7th Cir. 2005). The evidence must relate to the specific employment decision in question and is essentially "an 'outright admission' that a challenged action was undertaken for one of the forbidden reasons covered in Title VII." Id.; Cardoso v. Robert Bosch Corporation, 427 F.3d 429, 432 (7th Cir. 2005).

Circumstantial evidence under the direct method allows the trier of fact "to infer intentional discrimination by the decisionmaker." Rudin, 420 F.3d at 720. The Seventh Circuit has recognized three types of circumstantial evidence of intentional discrimination:

---

[3] Mosley also asserts a claim of racial discrimination under 42 U.S.C. § 1981. However, his § 1981 claim need not be separately addressed, as the standards for resolving such claims are indistinguishable from those applied under Title VII. Accordingly, Mosley's § 1981 claim is implicitly resolved by the resolution of the Title VII discrimination claim.

> The first consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. . . . Second is evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment. . . . [T]hird is evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief. . . .

Id. at 721, *citing* Troupe v. May Department Stores, 20 F.3d 734, 736 (7th Cir. 1994).

In order to establish his prima facie case under the direct method, Mosley must prove that Maytag was motivated by racial animus when it rejected him for the promotions in 2001. He clearly has no direct evidence of discriminatory animus. Rather, Mosley relies on alleged racially offensive comments by a non-decisionmaker and racially offensive graffiti. Mosley argues that Unger, the decisionmaker with respect to the April 2001 promotion in this case, admitted to hearing the offensive word used on occasion and saw the offensive graffiti yet did nothing to remedy the situation. However, the record is devoid of evidence indicating that any of these instances were connected to the promotions at issue or that Unger uttered the words, wrote the graffiti, or expressed any opinion condoning or promoting such conduct. See Dandy v. United Parcel Service, Inc., 388 F.3d 263, 272 (7th Cir. 2004); Schuster v. Lucent Technologies, Inc., 327 F.3d 569, 576 (7th Cir. 2003). Moreover, on the occasion when Mosley claims to have observed offensive graffiti in Unger's presence, Mosley testified that Unger stated, "I don't condone that," which actually suggests a lack of racial animus. (Mosley Dep. at 133). Nor is there any evidence linking Lamb to any of this conduct or establishing any racial animus on his part.

Accordingly, this evidence is legally insufficient to establish discriminatory motivation by either decisionmaker under the direct method.

Mosley next relies on "compelling statistical evidence demonstrating race discrimination in promotions throughout Maytag's Galesburg plant." In support of this assertion, he cites the following facts: (1) from January 1, 2000, to November 2000, there were a total of six hires or promotions into management or supervisory positions in the door production area; all successful candidates were white; (2) during the same period, three white employees "leap-frogged" over him into Door Production management positions above him notwithstanding his credentials and tenure with the company; (3) during the same period, Maytag promoted 14 individuals into supervisor or management positions in the Manufacturing division, all of whom were white; and (4) as of January 1, 2000, only four of Maytag's 316 supervisor or manager employees were African American. By January 2001, only three of the 309 supervisor or management employees were African American, and by May 2003, this number was zero.

With all due respect, this "statistical" evidence is legally insufficient. First, the Seventh Circuit has "rejected efforts to use statistics as the primary means of establishing discrimination in disparate treatment situations." Bell v. Environmental Protection Agency, 232 F.3d 546, 552 (7th Cir. 2000), *citing* Plair v. E.J. Brach & Sons, Inc., 105 F.3d 343, 349 (7th Cir. 1997). Although such evidence can sometimes be utilized in conjunction with other evidence in an individual disparate treatment case, such statistical evidence is generally relevant only to the question of demonstrating pretext provided that the statistics "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" and encompass the

relevant labor market. Bell, 232 F.3d at 553. Even assuming that it could properly be considered as part of a direct case of individual discrimination, it would still be insufficient since the proffered evidence makes no attempt to consider the relevant labor market or demonstrate statistical disparity between the racial composition of Maytag's workforce and the racial composition of the Galesburg area. Thus, the "statistical" evidence offered by Mosley cannot satisfy his burden of establishing discriminatory intent under the direct method, either alone or in conjunction with the evidence of alleged racial comments and graffiti.

      B.     Indirect Method

Having failed to present direct evidence of racial discrimination, Mosley must then attempt to proceed under the McDonnell Douglas burden-shifting analysis. Under this analysis, Mosley must carry the initial burden of establishing a prima facie case of discrimination by showing: 1) he was a member of a protected class; 2) he was performing her job satisfactorily and was qualified for the position that he in fact sought; 3) he was rejected for the position; and 4) the employee selected was not a member of the protected group and was not better qualified than he was. McDonnell Douglas, 411 U.S. at 802; St. Mary's Honor Center v. Hicks, 113 S.Ct. 2742, 2747 (1993); Grayson v. City of Chicago, 317 F.3d 745, 748 (7th Cir. 2003); Perez v. Norwegian-American Hospital, Inc., 2004 WL 422555, at *3 (7th Cir. March 5, 2004); Johnson v. Nordstrom, Inc., 260 F.3d 727, 732 (7th Cir. 2001). While Maytag does not contest Mosley's ability to satisfy the first and third prongs of this analysis, his compliance with the second and fourth criteria is challenged.

      1.     April 2001 Promotion

Maytag first contends that Mosley was not qualified for the April 2001 position. With respect to the April 2001 promotion to General Supervisor, Door Production Promotion. The written requirements for this position were the following:

> Incumbent is responsible for assuring timely production of fabricated and painted doors necessary to satisfy manufacturing schedule requirements utilizing lean manufacturing techniques and Six Sigma principles.
>
> The successful candidate must possess a minimum of an associates degree in a management-related field, 3-5 years of supervisory experience in the fabrication department of a manufacturing facility, exceptional interpersonal skills, and PC experience. Experience with ISO 9001, implementing lean manufacturing practices. In a fast-paced, high volume production environment, and responsibility for the interpretation and administration of a collective bargaining agreement are highly preferred.

Unger testified that he considered and rejected Mosley because of his lack of interpersonal skills, lack of leadership capabilities, and lack of drive. Thus, Maytag asserts that Mosley was not qualified for the position.

Mosley responds that he had an associate's degree, more than 20 years of supervisory experience, had received positive commendations regarding his interpersonal skills, and had PC experience. Moreover, he had extensive experience with ISO 9001, lean manufacturing principles, Kaizan, and implementing collective bargaining agreements. He also received favorable performance evaluations praising his leadership, diligence, willingness to meet the department's responsibilities, and ability to motivate his subordinates. Mosley further argues that Maytag made no reference to the alleged deficiencies in his qualifications in its EEOC Position Statement or in response to the EEOC questionnaire. Rather, before the EEOC, Maytag stated that he was rejected for the position because he did not possess knowledge and experience in lean manufacturing

principles, kaizen principles and TPM principles. In response to the EEOC questionnaire, Maytag gave the reason as Mosley's not having a bachelor's degree even though the position description only requires an associate's degree.

Based on the present state of the record, the Court must conclude that there is a genuine issue of material fact with respect to whether or not Mosley was qualified for the April 2001 promotion. Although Mosley's ability to ultimately convince a jury that he was qualified for this position is far from clear, the Court cannot find that no reasonable jury could find in his favor on this issue. That being said, it is undisputed that Ginglen, the employee selected to fill the position, was not a member of the protected group, so the question then becomes whether Mosley was as qualified as Ginglen.

In response, Mosley asserts that Ginglen was a poor performer who was fired within six months of his hire. By contrast, he claims that he had excelled at various tasks in his more than 30 years at Maytag, including the ability to supervise and train between 15 and 103 employees, and had significant experience and training in Kaizen principles, Lean methodologies, and Six Sigma methodologies. Respectfully, the Court notes that this argument is nothing more than a reiteration of Mosley's argument that he was qualified for the position and does not even come close to establishing that he was as qualified as Ginglen for the position of General Supervisor, Door Production. The fact that Ginglen was ultimately let go as part of a reduction in force does not in any way undermine the quality or quantity of his qualifications as reflected in his resume when presented to Maytag at the time it made its hiring decision.

It is well established that a plaintiff cannot defeat summary judgment through conclusory allegations that are nothing more than "[s]elfserving assertions without factual

support in the record." Weeks v. Samsung Heavy Industries Co., Ltd., 126 F.3d 926, 934 (7th Cir. 1997), *quoting* Jones v. Merchants National Bank and Trust Co., 42 F.3d 1054, 1058 (7th Cir. 1994). Mosley's bald assertion that he was as qualified as Ginglen is not enough to survive summary judgment on this claim, particularly as there is unrefuted evidence in the record as to Ginglen's credentials and qualifications. Ginglen's resume indicated that he had an associate's degree in engineering and a bachelor's degree in business administration, as well as extensive and varied manufacturing experience. For eight years, Ginglen had been a senior manufacturing engineer functioning as a business unit manager at Textron Automotive Company. In this capacity he directed the activities of both supervisors and production employees, achieved substantial cost reduction objectives, and participated in numerous Kaizen and 5-S improvement programs. Prior to that position, Ginglen had spent nine years running his own company and specialized in procuring government contracts for engineering projects. He was the president and general manager of Illini Industries for three years, during which time he built the company to specialize in manufacturing for government and military entities and achieved a $3,000,000 annual gross before selling to his partner. Finally, Ginglen had spent 18 years with International Harvester Company, during which time he worked his way up to industrial engineering supervisor, represented the company in union negotiations, and was responsible for productions standards, methods improvements, and all cost reduction programs in a 1,500 employee plant. As Mosley has failed to meet his burden of demonstrating that Maytag promoted someone outside of his protected group who was substantially less qualified than he was, he has necessarily failed to present a prima facie case of racial discrimination under Title VII with respect to this failure to promote claim.

### 2. October 2001 Promotion

Maytag next argues that Mosley was not qualified for the October 2001 promotion. In support of this argument, Maytag has introduced unrefuted evidence indicating that only employees holding General Supervisor positions were considered for the combined position. Given the fact that Mosley was not a General Supervisor, Maytag concluded that he was not qualified for the promotion.

Mosley argues that he was qualified for this position because holding a title of General Supervisor was not expressly stated as a requirement for the job. He then argues that some of the candidates considered (whom the Court notes were all General Supervisors) were not worthy of the promotion before suggesting, without any evidentiary support, that Sobie must have been pre-selected for the promotion. He then summarily concludes that he has presented sufficient evidence about the selection process and his own qualifications to case serious doubt on Maytag's justifications and defeat the Motion for Summary Judgment. While Mosley makes sweeping and conclusory allegations of pretext, he completely neglects the requirement that he must first establish each of the elements of a prima facie case before pretext becomes an issue under the indirect method.

It is undisputed that Mosley was not a General Supervisor, and the record is devoid of evidence indicating that anyone other than General Supervisors were considered for this position. There is no basis in the record that would promote a finding that the requirement that a candidate for the position already hold the title of General Supervisor was not a legitimate criterion. Moreover, even assuming that Mosley has raised a genuine issue of material fact as to whether he was qualified for the October 2001 promotion, he has made no effort to establish that Sobie was not more qualified than he was. Thus, for the same

reasons set forth above with respect to the April 2001 promotion, he has failed to make out a prima facie case of discrimination for the October 2001 promotional opportunity.

Furthermore, "[w]e do not sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of that decision. Our only concern is whether the legitimate reason provided by the employer is in fact that true one." Stewart v. Henderson, 207 F.3d 374, 378 (7th Cir.2000).  Even assuming arguendo that Mosley could make out a prima facie case of racial discrimination, Maytag has articulated legitimate, non-discriminatory reasons for its decisions, and he fails to show pretext.  To demonstrate pretext, Mosley must demonstrate that Maytag did not believe that Sobie was a better qualified candidate; it is irrelevant whether the belief was accurate. See Rudin, 420 F.3d at 727 (pretext inquiry focuses on honesty of employer's belief, not accuracy of belief). The record in this case "does not establish that [Mosley] was so clearly superior to the finalists chosen that no reasonable person exercising impartial judgment could have made the same decision that the [decisionmaker] did." Holmes v. Potter , 384 F.3d 356, 361-62 (7th Cir. 2004), *citing* Millbrook v. IBP, Inc., 280 F.3d 1169, 1180-81 (7th Cir. 2002). Maytag is therefore entitled to summary judgment on his disparate treatment claim.

II.     Retaliation

Title VII provides in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). Under the direct method for proving retaliation, a plaintiff must present direct evidence of: (1) a statutorily protected activity; (2) an adverse action taken by the employer; and (3) a causal connection between the two. Rhodes v. Illinois Department of Transportation, 359 F.3d 498, 508 (7th Cir. 2004); Williams v. Waste Management of Illinois, 361 F.3d 1021, 1031 (7th Cir. 2004). Although other formulations of a prima facie case of retaliation have been used in the past, the Seventh Circuit has clarified that an indirect prima facie case of retaliation requires the following showing:

> [A]n employee must demonstrate that: (1) [he] engaged in statutorily protected activity; (2) [he] performed [his] job according to [his] employer's legitimate expectations; (3) despite meeting [his] employer's legitimate expectations, [he] suffered a materially adverse employment action; and (4) [he] was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.

Hilt-Dyson v. City of Chicago, 282 F.3d 456, 465 (7th Cir. 2002), *citing* Stone v. City of Indianapolis Pub. Utils. Div., 280 F.3d 640, 644 (7th Cir. 2002); Spencer v. Thomas, 2002 WL 378179, at *3 (7th Cir. March 7, 2002); Haywood V. Lucent Tech., Inc., 323 F.3d 524, 531 (7th Cir. 2003). In the absence of direct evidence, "failure to satisfy any element of the prima facie case proves fatal to the employee's retaliation claim." Hilt-Dyson, 282 F.3d at 465. If the plaintiff establishes a prima facie case through the indirect method, the defendant may then come forward with a legitimate, non-invidious reason for the adverse action. Haywood, 323 F.3d at 531. "Once the defendant presents a legitimate non-invidious reason for the adverse employment action, the burden shifts back to the plaintiff to show that the defendant's reason is pretextual." Id.

It is undisputed that Mosley engaged in statutorily protected activity by filing his EEOC charge and participating in the EEOC's process. However, Maytag asserts that

Mosley cannot demonstrate that he suffered an adverse employment action and that there is no causal connection between his EEOC charge and the fact that he had to meet additional requirements for his merit review and was given an additional job assignment.

The Court agrees that neither of these actions constitute an adverse action by the employer. Title VII is not a general civility code for the workplace, and not everything that makes an employee unhappy is actionable as an adverse action. Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998); Smart v. Ball State University, 89 F.3d 437, 441 (7th Cir. 1996). Rather, a plaintiff must have suffered a "materially" adverse action. Id.

> A materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

Crady v. Liberty National Bank & Trust Co. of Indiana, 993 F.2d 132, 136 (7th Cir. 1993); Cheek v. Peabody Coal Co., 97 F.3d 200, 204 (7th Cir. 1996). The addition of goals to a merit appraisal and an additional job assignment simply do not rise to the level of an actionable adverse employment action.

Apparently mindful of this deficiency, Mosley now asserts a new theory for his adverse action. Specifically, he argues that once Maytag learned that Professor Hord was assisting him in the EEOC process, Gregory Irwin ("Irwin"), Maytag's Vice President of Human Resources, called the President of Knox College and informed him that a Knox professor had made a disparaging remark about Maytag while participating in Mosley's mediation. When Hord met with the President, the President indicated that Hord should

let him know in advance about his attendance at the EEOC and asked, "Why didn't you come to me?" Hord then declined to further assist Mosley in his proceedings, which Mosley contends sent a clear message that people who helped him would be punished. Thus, Mosley contends that as a result of his protected activity, he suffered consequences that would deter a reasonable person from filing or supporting a charge of discrimination against Maytag.

Mosley is correct that retaliation can take the form of actions outside of the workplace. Washington v. Illinois Department of Revenue, 420 F.3d 658, 660 (7th Cir. 2005). "But it does not follow from the fact that retaliation may be found in events away from the employer's premises that every unwelcome response is forbidden retaliation." Id. To be actionable, an adverse action must be "material." Id. at 662. Although the Seventh Circuit has recognized that bureaucratic nastiness or threats may be material when made against an altruistic employee who is supporting a colleague's charge of discrimination, as it takes less to deter an altruistic act than to deter a self-interested one, such is not the case here. Id.

Mosley's charge of discrimination was clearly self-interested rather than altruistic, and there is no indication that Irwin's call to the President of Knox College or Hord's subsequent withdrawal from assisting him would have dissuaded a reasonable worker from making a charge of discrimination. Id. The record is devoid of evidence indicating that Irwin demanded that the President of Knox College take action against Hord, that Hord was actually forbidden from assisting Mosley, or that Mosley was unable to proceed without Hord's assistance. In fact, the only consequence alleged by Mosley is that because Hord felt intimidated by the President's inquiry with respect to his participation in the mediation,

Mosley's ability to rely on Hord for any future assistance with his charge of discrimination was "severely compromised." The record is likewise devoid of evidence that Mosley was deterred or dissuaded from pursuing his charge or this litigation; in fact, all evidence is to the contrary. Accordingly, the Court must conclude that Mosley has failed to demonstrate that he suffered any material adverse action, and his retaliation claim would therefore fail under either the direct or indirect method.

Although the Court must exercise caution in granting summary judgment in cases such as this, where intent and credibility are arguably crucial issues, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. The Court has an obligation to remove factually insubstantial cases from its docket where "no rational jury could, on the evidence presented in the summary judgment proceeding, bring in a verdict for the party opposing summary judgment." Mills, 83 F.3d at 846. After considering the record as a whole, the Court finds that Mosley has failed to present sufficient evidence from which a reasonable jury could infer that he suffered a material adverse action or that the actions complained of were actually taken in retaliation for his having filed a charge of discrimination with the EEOC. Accordingly, Maytag is also entitled to summary judgment on the retaliation claim.

**CONCLUSION**

For the foregoing reasons, Maytag's Motion for Summary Judgment [#19] is GRANTED.  This matter is now TERMINATED.

ENTERED this 27th day of January, 2006.

s/ Michael M. Mihm
Michael M. Mihm
United States District Judge
